NELSON P. COHEN
United States Attorney

GARY M. GUARINO
Assistant U.S. Attorney
222 West Seventh Avenue, #9
Anchorage, Alaska 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-2344
E-mail: gary.guarino@usdoj.gov

Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SHARON MILLER,<br><br>        Plaintiff,<br>v.<br><br>UNITED STATES<br>        Defendant. | Case No. 3:04-cv-00144-JKS<br><br>**DEFENDANT'S TRIAL BRIEF** |

The United States of America submits its trial brief on the contested issues in this case.

### I.  Introduction: Parties And Timeline Of Events

Plaintiff Sharon Miller filed this medical malpractice lawsuit against Dr. Erik Maurer, Dr. Marjorie Smith, Dr. Jean Snyder, and the United States. [Docket 1] The claims against the United States, under the Federal Tort Claims Act

(FTCA)[1], were based on the alleged conduct of Dr. Thomas Hunt and Dr. Ying-Jian Wu.  They were family practice doctors for the Anchorage Neighborhood Health Center (ANHC) and they are deemed to be employees of the United States for the FTCA.  28 U.S.C. § 2679(d).  Plaintiff subsequently dismissed her claims against Dr. Maurer, Dr. Snyder, and Dr. Smith. [Docket 24, 25, 35]  The case is proceeding on the FTCA claims against the United States for the medical care by Dr. Hunt and Dr. Wu.

Plaintiff seeks damages for brain injuries including multiple strokes, subdural bleeding, and resulting brain damage, the cause(s) of which have never been medically diagnosed or determined.  **The timeline**, for Plaintiff's medical conditions, her contacts with various doctors, the medical care she received at hospitals in Alaska and in Tennessee, and the strokes and brain injuries that she experienced, **extends from May 2000 through April 2001**.[2]  During these months, Plaintiff had numerous exams and diagnostic tests and she received care from dozens of doctors and specialists including emergency room physicians, primary and family care physicians, neurologists and neurosurgeons, and other

---

[1] 28 U.S.C. §§ 2671-2680.

[2] The medical records have been marked as Defendant's Exhibit D-1.

specialists in neuro-opthamology, neurology, intensive care, endocrinology, infectious diseases, and rehabilitation medicine.

None of these doctors and specialists were able to diagnose the cause of Plaintiff's brain injuries and underlying strokes and medical conditions. They were never able to determine an effective preventive or curative treatment for Plaintiff's multiple cerebral strokes and subdural bleeding. Dr. Richard Hoos was a neurologist who treated Plaintiff when she was transferred from Alaska and admitted for care at the Vanderbilt University Medical Center (VUMC). At his deposition, Dr. Hoos testified that the cause of Plaintiff's cerebral strokes and bleeding was never determined, even after the medical specialists at VUMC reviewed all of the records and diagnostic tests and studies from Plaintiff's medical care in Alaska (October 2000 to January 2001) and at VUMC (January 27 to April 2001).

Initially, from **May 2000 to August 2000**, Plaintiff received treatment from physicians and neurologists in Tennessee. She complained of headaches and episodes of vision problems, numbness, dizziness, weakness, and balance problems. She was diagnosed with Graves disease (hyperthyroidism) and treated

with radiation therapy.  In the Fall of 2000, she moved to Anchorage and began work as a nurse at Providence Alaska Medical Center (PAMC).

In **October to November 2000**, Plaintiff was examined and treated at the PAMC emergency room on four dates and she was admitted to PAMC from November 2 to November 4, 2000.  She presented with complaints of headache, nausea, dizziness, and neck pain.  She was suspected of having meningitis and she had an extensive workup by the PAMC doctors and specialists, including two lumbar punctures (to check the spinal fluid for infection) and a CT scan and MRI scan of her brain.  The doctors and a neurologist, Dr. Marjorie Smith, found that Plaintiff had small fluid collections ("bilateral hygromas") between her brain and the covering layer ("dura mater") and an enhancement of the dura.  They were attributed to her recent lumbar puncture and they were not deemed diagnostically significant for her ongoing symptoms.  She was discharged with a diagnosis of "intractable headache" and with pain medications and instructions to follow up with her primary care physicians and neurology.

Significantly, Plaintiff has claimed that the neurologist, Dr. Marjorie Smith, and other PAMC physicians were negligent in their treatment of Plaintiff during her admission in November 2000.  Plaintiff submitted an expert report from a

neurologist who stated that "Dr. Majorie Smith and the other treating physicians at [PAMC]" failed to properly interpret the MRI scan, they failed to obtain a neurosurgical consult before doing a second lumbar puncture, and they failed to provide adequate follow up care in November 2000. Despite this report, Plaintiff dismissed her claims against Dr. Smith and Dr. Jean Snyder (one of the treating doctors in November 2000) and Plaintiff has not asserted claims against the other PAMC physicians.

More importantly, for the claims against the United States, **Dr. Wu and Dr. Hunt had no contact with Plaintiff during May through November 2000**. She was not their patient. They were not involved in the treatment she received in Tennessee or in the exams, CT and MRI scans, lumbar punctures, diagnosis, and treatment that she received at PAMC in October and November 2000. The United States is not liable for any medical care provided by the physicians and specialists in Tennessee or at the PAMC in October and November 2000.

Dr. Wu and Dr. Hunt had their **first and only contact with Plaintiff** during the weekend of **December 1 to December 3, 2000**. On Friday, December 1, she presented at the PAMC Family Practice clinic with complaints of lethargy and decreased mental status over the prior five days. She was referred to PAMC and

examined by Dr. Scott Dull, an emergency room physician. She was then admitted to PAMC by Dr. Wu, who was the "on call" doctor under a call-sharing arrangement between the ANHC and the PAMC Family Practice group. Dr. Wu examined Plaintiff and recommended a consultation with a neurologist. **Dr. Wu had no further contact with Plaintiff after this initial exam**. She was also examined by two other doctors, Dr. Sharon Lemmons and Dr. Marin Granholm, who then consulted with a neurologist, Dr. Mary Downs.

    Dr. Downs told the physicians to hold off on further studies until Dr. Downs examined Plaintiff. The next morning, Saturday, December 2, Dr. Downs interviewed Plaintiff, reviewed her prior records, and conducted a neurological examination. Dr. Downs did not diagnose any neurological abnormalities and she did not order or recommend any further imaging studies (MRI or CT scan) of Plaintiff's brain. Instead, Dr. Downs recommended that the doctors continue treating Plaintiff's thyroid condition and headaches with medications. That same day, Dr. Hunt was the "on call" doctor in place of Dr. Wu. He talked to Plaintiff, reviewed her medical records, and consulted with Dr. Downs regarding her neurological exam and treatment recommendations. Plaintiff told Dr. Hunt that

she was feeling much better, that her headaches had almost resolved, and that she wanted to be discharged so that she could return to her work.

On December 3, Plaintiff again told Dr. Hunt that she was feeling much better and she wanted to be discharged. After having consulted with Dr. Downs and the other PAMC doctors, Dr. Hunt discharged Plaintiff with medications (for her thyroid condition and headache) and with instructions to follow up with her primary physicians (the Family Practice clinic) in one to two weeks. **Dr. Hunt had no further contact with Plaintiff after her discharge on December 3.**

After this, Plaintiff had follow up visits and phone calls with the doctors and nurses at the Family Practice clinic on **December 15** (visit with Dr. Jeffrey Wilt), **December 22** (phone call regarding her medication), **December 28** (visit with Dr. Ellen Hodges), **December 30** (phone call), and **December 31** (phone call). At various times during these contacts, Plaintiff reported memory problems and episodes of dizziness, weakness, vision problems, headaches, and vomiting. The Family Practice physicians did not order further tests or imaging studies and they did not refer Plaintiff to PAMC or to a neurologist or other specialist.[3]

---

[3] Plaintiff has not asserted negligence claims against these Family Practice doctors.

On **January 1, 2001**, Plaintiff was taken by ambulance to PAMC with symptoms of worsening headache, vomiting, and decreased mental status. From **January 1 to January 27**, **2001**, Plaintiff received intensive medical care at PAMC including lab tests, imaging studies, surgery (to drain fluid from her brain), medications, and exams by consulting specialists. While at PAMC, Plaintiff had multiple cerebral strokes and subdural bleeding leading to focal brain damage with vision loss and memory problems.

From **January 27 to April 19, 2001,** Plaintiff was transferred and received treatment at the VUMC in Tennessee. As noted above, the physicians at PAMC and VUMC were never able to determine the cause(s) for Plaintiff's cerebral strokes and subdural bleeding. She was discharged from VUMC in April 2001.

## II.   Legal Theory and Defenses For Plaintiff's Medical Malpractice Claim

### A.   Liability Issues

The FTCA provides that the United States shall be liable for damages for tort claims to the same extent that a private party would be liable to the claimant "in accordance with the law of the place where the act or omission occurred."[4]

---

[4] 28 U.S.C. §§1346(b) and 2674.

The alleged medical negligence in this case occurred in Anchorage. Thus, Alaska law establishes the required elements for Plaintiff's medical malpractice action.[5]

The standards and burden of proof for malpractice claims under Alaska law are set out in **AS 09.55.540**. Plaintiff has the burden to prove, by a preponderance of the evidence, the applicable standards of medical care in the field or specialty, that the Defendant breached these standards of care, and that the Defendant's breach proximately caused Plaintiff injuries that she would not otherwise have incurred.[6] Under Alaska law, in malpractice actions there is no presumption of negligence by the Defendant.[7] Plaintiff must offer expert opinions and testimony in order to support her claims and to prove the required elements under AS 09.55.540(a).[8] If Plaintiff is unable to offer expert testimony to prove all of the required elements, judgment may be entered in favor of the United States.[9]

---

[5] Sullivan v. United States Dep't. of the Navy, 365 F.3d 827, 832 (9th Cir. 2004); Yako v United States, 891 F.2d 738, 745 (9th Cir. 1989).

[6] AS 09.55.540(a).

[7] AS 09.55.540(b).

[8] Parker v Tomera, 89 P.3d 761, 765-66 (Alaska 2004).

[9] Parker, 89 P.3d at 766; Kendall v State, Division of Corrections, 692 P.2d 953, 955 (Alaska 1984).

Plaintiff will claim that Dr. Wu and Dr. Hunt breached the standards of medical care because they did not order a CT scan or MRI scan of Plaintiff during her admission at PAMC on December 1 to December 3, 2000. The United States will defend on the grounds that Dr. Wu and Dr. Hunt properly examined Plaintiff, reviewed her records, and referred her for an evaluation by a neurologist, Dr. Mary Downs. The United States will present evidence, from treating physicians and medical experts, that it is standard medical practice for family practice doctors like Dr. Wu and Dr. Hunt to consult with and follow the diagnostic and treatment recommendations of a specialist/neurologist such as Dr. Downs. This is particularly the case where Plaintiff is alleging complex neurological conditions and brain injuries. Plaintiff has not claimed that Dr. Downs was negligent in her examination and treatment recommendations.

Further, Dr. Wu and Dr. Hunt had only very limited involvement as "on call" doctors and they were not Plaintiff's primary physicians. The United States will present evidence that it was medically appropriate for Dr. Hunt to discharge Plaintiff for follow up care with her primary doctors at the Family Practice clinic. Plaintiff had several follow up visits and contacts with the Family Practice doctors

prior to her worsening condition and admission to PAMC in January 2001. Plaintiff is not asserting negligence claims against these other doctors.

Plaintiff will be required to present medical expert opinions and evidence that the alleged negligence by Dr. Wu and Dr. Hunt proximately caused Plaintiff's cerebral strokes and brain injuries. The United States will defend on the grounds that there is no medical evidence to prove the "causation elements" in this case. As noted above, none of the many doctors and specialists who saw Plaintiff, between October 2000 and April 2001, were able to identify the cause(s) of Plaintiff's neurological conditions or to determine an effective treatment. After Plaintiff was admitted to PAMC in January 2001, her treating doctors and neurosurgeon and the many consulting specialists were unable to prevent her from having multiple cerebral strokes and brain injuries. There is no medical evidence that any additional exams, tests, or referrals would have led to an effective diagnosis and treatment for Plaintiff's neurological conditions and brain injuries.

B.   **Damages Claims**

Plaintiff seeks recovery of past and future economic and noneconomic losses. Plaintiff's damages and recovery, if any, are subject to and limited by the provisions of Alaska law, including **AS 09.17.010 to AS 09.17.900**, to the extent

that these provisions are not inconsistent with the FTCA. The standards and limits for awards of past or future economic or noneconomic damages are set out in AS 09.17.010 and in AS 09.17.040, including the proper calculation and reduction of future economic losses to present value. <u>Beck v. State, Dep't of Transp. & Pub. Facilities</u>, 837 P.2d 105, 116-17 (Alaska 1992).

Under **AS 09.55.548(b)**, Plaintiff is not entitled to recover any portion of her alleged damages that have been paid or compensated via collateral sources including any private or group insurance. If Plaintiff establishes a claim for recovery of medical expenses, she may only recover as damages the portion of expenses <u>that</u> <u>exceed</u> the amounts received by or paid for Plaintiff from collateral sources. AS 09.55.548(b). The only exception would be where the collateral source is a federal program that is required by law to seek subrogation.

Plaintiff is not entitled to recover prejudgment interest or attorney's fees against the United States. **28 U.S.C. §§ 2674 and 2678**; <u>Anderson v. United States</u>, 127 F.3d 1190, 1191 (9th Cir. 1997).

### III.  <u>Evidentiary Issues</u>

To date, the United States is not aware of any evidentiary issues that need to be addressed prior to trial. Plaintiff has not yet served the United States with

Plaintiff's Trial Exhibit List.  The United States has served Plaintiff with the United States' Trial Exhibit List and a marked set of the United States' proposed trial exhibits is being filed with the Court concurrently with this trial brief.  Counsel for the United States was prepared to meet with Plaintiff's counsel to review and discuss the parties' proposed exhibits and any issues regarding their admissibility.  However, Plaintiff's counsel was not available to meet to present and review the proposed exhibits.  Counsel for the United States will be attempting to schedule another meeting to review the proposed trial exhibits.  Any evidentiary issues as to Plaintiff's proposed trial exhibits will be asserted after the United States has the opportunity to review Plaintiff's proposed exhibits.

    RESPECTFULLY SUBMITTED submitted this 11th day of September, 2006 at Anchorage, Alaska.

NELSON P. COHEN
United States Attorney

s/Gary M. Guarino
Assistant U.S. Attorney
222 West 7th Ave., #9, Rm. 253
Anchorage, AK 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-2344
E-mail: gary.guarino@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on September 6, 2006, a copy of the foregoing DEFENDANT'S TRIAL BRIEF was served on the following by regular U.S. mail:

James A. Wendt, Esq.
Law Offices of James Alan Wendt
425 G Street, Suite 600
Anchorage, Alaska   99501-2001


s/ Gary M. Guarino